IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRISTAN JENSEN,

                            Plaintiff,

            v.

ANTHONY BUDREAU, ERIC SWAN,
and PAUL SUSIENKA,

                    Defendants.

                                          OPINION AND ORDER

                                               20-cv-997-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

On February 25, 2019, Bayfield County area law enforcement officers responded to a 911 call reporting a domestic violence incident perpetrated by plaintiff Tristan Jensen, who was reported to still be in the home. The first officer on the scene, Eric Swan, located plaintiff in a downstairs bathroom. After plaintiff refused to come out voluntarily, Swan deployed two blasts of pepper spray into the bathroom to gain plaintiff's compliance, then handcuffed her and escorted her outside, where she was secured in his squad car. Shortly thereafter, one of the other responding officers, Bayfield County Sheriff's Deputy Anthony Budreau, transported plaintiff to the Bayfield County jail, where she was allowed to wash her face and eyes approximately 40 minutes after she was sprayed.

In this action brought under 42 U.S.C. § 1983, plaintiff contends that Budreau and Swan's failure to provide her with "field decontamination" for her exposure to pepper spray after the scene was secured constituted excessive force and deliberate indifference to her medical needs, in violation of her rights under the Fourth and Fourteenth Amendments. In

1

addition, she asserts a claim for municipal liability against defendant Paul Susienka, the Bayfield County Sheriff, under <u>Monell v. Dep't. of Soc. Services</u>, 436 U.S. 658 (1978).

Defendants Budreau and Susienka have moved for summary judgment. Dkt. #30. (Swan has not joined the motion.) I will grant their motion. As explained below, even viewed in the light most favorable to plaintiff, the undisputed facts establish that Budreau's decision to transport plaintiff to the jail without offering on-site decontamination was objectively reasonable under the circumstances. Accordingly, plaintiff cannot establish any violation of her constitutional rights. Furthermore, even assuming she could show a constitutional violation, plaintiff has failed to show that such a right was clearly established at the time in question. Accordingly, Budreau is entitled to qualified immunity.

Turning to the undisputed facts, I note that the many of the material facts were captured on chest camera video and dash camera audio submitted by the parties. On the basis of these recordings and other evidence submitted by the parties, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

Plaintiff Tristan Jensen is an adult resident of Bayfield County, Wisconsin. Defendant Anthony Budreau is a sergeant with the Bayfield County Sheriff's Department. Defendant Paul Susienka is the sheriff of Bayfield County. Defendant Eric Swan is a patrol officer for the Red Cliff police department,

At approximately 10:15 p.m. on February 25, 2019, the Bayfield County Emergency 911 operator received a 911 call from Caitlin Olby.  Olby reported that plaintiff, who was married to Olby's mother, Katrina Washeleski-Burns, had attacked her and her mother and punched her mother in the face.  Olby told the dispatcher that her mother was bleeding badly from her face, there was blood and broken objects everywhere, her mother and plaintiff were severely intoxicated, and plaintiff was still in the residence.  The dispatcher called an ambulance and law enforcement to respond to the residence, which was located on New Housing Road in Bayfield, Wisconsin.

Swan was the first law enforcement officer on the scene, arriving at approximately 10:30 p.m.  The entry of the residence leads to a small main floor vestibule, from which one can either go upstairs to a main floor living area or downstairs to a lower level.  Washeleski-Burns, Olby, Olby's boyfriend, and a friend, Nicole Dietrich, were on the main floor.  After making contact with these individuals, Swan went downstairs, where he found plaintiff in the bathroom.  After plaintiff refused to come out voluntarily, Officer Swan forced the door partly open and deployed two separate blasts of oleoresin capsicum (OC) pepper spray toward plaintiff's head, face, and eye.  Swan then extracted plaintiff from the bathroom, placed her into a prone position, and handcuffed her.  Plaintiff does not contest the reasonableness of Swan's use of pepper spray.

Defendant Budreau and Bayfield Police Officer Joshua Novak (who is not a defendant) responded to the scene and entered the residence at approximately the same time.  Novak was wearing a chest camera.  Budreau was wearing a microphone that

3

transmitted audio to the dash cam in his vehicle.  By the time Budreau and Novak arrived, Swan had deployed the pepper spray and handcuffed plaintiff, and he and plaintiff were in the lower level of the home.  Budreau was not aware at that time that plaintiff had been exposed to OC spray.

Budreau went up the stairs leading from the vestibule to the home's main level, where he spoke with Washeleski-Burns and assessed her condition.  Meanwhile, Swan assisted plaintiff up to a standing position and escorted her from the lower level to the main floor vestibule, where Officer Novak was standing.  Novak began to assist Swan in locating plaintiff's shoes.  Plaintiff, whose eyes were closed, yelled numerous times that her eyes were burning, and she loudly asked the officers several times if they could "wash this out of my eye."  Plaintiff, who appeared to be intoxicated, was also yelling obscenities and complaining that Officers Swan and Novak were not adequately helping her get her shoes on.  She was not coughing, gagging, or breathing heavily.

Washeleski-Burns, who was also intoxicated, told Budreau that she wanted plaintiff removed from the home.  Even if Washeleski-Burns had not said this, the officers would have removed plaintiff anyway:  separating the actor and the victim is standard police protocol in domestic violence situations.  It is also standard for law enforcement officers to get the arrestee under control and make sure the scene is safe before tending to someone with non-emergency injuries on the scene.

At about 10:38 p.m., Swan and Novak escorted plaintiff to Swan's squad car from the vestibule outside.  Plaintiff was belligerent during the escort, and continued to complain

about her eyes burning.  At one point, she dropped to her knees and screamed that her eyes hurt.  (The parties dispute whether plaintiff's knees "buckled" or whether she dropped to the ground intentionally.)  Swan told plaintiff that she would be taken to a hospital to be treated for her OC exposure.

Budreau did not hear or see any of this, because he was still inside on the upper level of the home, speaking with Washeleski-Burns, who had a cut and a swollen nose.  Budreau asked dispatch to advise the first responders who were on the way that they should respond to the residence.

After securing plaintiff in Swan's squad car, Swan and Novak returned to the house, where Swan informed Budreau that plaintiff had been exposed to OC spray down in the lower level.  Budreau responded to the effect of, "Oh, so that's why I'm coughing."  Budreau suggested to Novak that he get his camera from his squad car and take photographs of the scene.  Emergency Medical Services arrived at the house at about 10:44 p.m..  Budreau met them, directed them to Washeleski-Burns, and provided them his assessment of her medical status.  He then offered to take plaintiff to the Bayfield County jail in his own vehicle so that Swan could finish up at the scene.

Plaintiff was transferred to Budreau's squad car.  When Budreau took custody of her, she was not shaking uncontrollably, coughing, gagging, or gasping for breath, nor did she appear to be weak.  Although it was dark outside, Budreau did not notice plaintiff's face appearing red or irritated.  During the transfer, plaintiff did not cry or yell and asked only if she could see her wife.

5

Once in the squad, Budreau told plaintiff she was being taken to the jail, which had an eyewash station and decontamination supplies. Budreau left with plaintiff at 10:49 p.m. At that time, EMS was still evaluating Washeleski-Burns, who was eventually taken to the hospital and given a diagnosis of a laceration and small fracture of her nose. The total length of time that Budreau was at the residence was approximately 14 minutes.

Budreau drove directly to the Bayfield County jail. The closest medical facility open at that hour was approximately 29 miles away, but the Bayfield County jail, which had an eyewashing station inside the garage, was approximately 17 miles away. Almost immediately after leaving the scene, Budreau asked dispatch to inform the Bayfield County jail that use of the eyewash station for decontamination due to OC exposure would be needed upon his arrival. At approximately 10:52 p.m., Budreau spoke with jail staff to ensure the eyewash station was ready, advising them that baby soap and towels would be needed. At approximately 10:53 p.m., Budreau asked plaintiff how she was doing, after she had been silent for about three minutes. Plaintiff responded that she could not see. Budreau assured her the jail was ready to treat her immediately upon arrival. Plaintiff then went silent for about eight minutes, prompting Budreau to verbally check on her welfare again. Plaintiff did not respond, until about 11:01 p.m., when she complained of pain. Budreau responded that he was attempting to get her treatment "as quick as we can." Plaintiff was silent for the remaining eight-minute ride to the jail. At no time on Budreau's audio can plaintiff be heard coughing or gasping for air.

Budreau arrived at the jail with plaintiff at approximately 11:09 p.m., about 20 minutes after leaving plaintiff's residence and about 40 minutes after Swan had sprayed the pepper spray in the bathroom. Budreau parked his vehicle alongside the eyewash station. Two county jail officers were waiting for plaintiff to arrive and had towels ready. Plaintiff was escorted to the eyewash station, where she was able to wash her face and rinse out her eyes. She was then brought in and booked. She had no need for a medical provider that evening. Budreau had no further interaction with plaintiff after she entered the building from the garage. Plaintiff later was charged with and pled guilty to battery, with domestic abuse and repeater modifiers.

Plaintiff alleges that she was subject to a continuous, painful burning sensation from the time she was exposed to OC spray until she was allowed to take a shower the next morning. She further alleges that she had a painful burning sensation in her neck for several weeks after her exposure, and continues to have problems with her peripheral vision and dry eyes. Plaintiff had a one-time visit with an ophthalmologist, documented as a "routine visit," to whom she reported that she had occasional pain and dryness in her left eye. The ophthalmologist prescribed artificial tears for the dry eye symptoms.

According to defendants' medical expert, whose opinion plaintiff does not dispute, the expected physical effects of exposure to OC spray are temporary and non-permanent irritation and light sensitivity. However, some individuals may display more severe reactions such as coughing, gagging, gasping for breath, red skin, rigid muscles, or weak legs. Bayfield County's law enforcement policy states that persons "sprayed with or otherwise affected by

the use of OC should be promptly provided with clean water to cleanse the affected areas. Those persons who complain of further severe effects shall be examined by appropriate medical personnel." As part of his own training, Budreau had had OC spray deployed in his face. He used water shortly afterward to flush out his eyes, but it did not ameliorate the burning sensation. In Budreau's experience, the only thing that helped for pepper spray exposure was the passage of time. In his case, he felt fine after 45 minutes.

OPINION

A. Summary Judgment Standard

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." Brummett v. Sinclair Broadcast Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. Celotex, 477 U.S. at 322. In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### B. Plaintiff's Claims Against Budreau

Plaintiff contends that defendant Budreau used excessive force and was deliberately indifferent to her serious medical needs, in violation of the Fourth and Fourteenth Amendments, by failing to provide her "some moderate level of field decontamination" from the pepper spray after she had been removed from the residence and the scene secured. As noted previously, Budreau denies that he violated plaintiff's constitutional rights, but says that even if he did, he is entitled to qualified immunity.

The first step in any § 1983 suit is to "isolate the precise constitutional violation" with which the defendant is charged. Baker v. McCollan, 443 U.S. 137, 140 (1979). "[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody." Currie v. Chhabra, 728 F.3d 626, 630 (7th Cir. 2013). Defendants contend that plaintiff was an arrestee, entitled to the protections of the Fourth Amendment, whereas plaintiff takes the position that she was a pretrial detainee, entitled to the protections of the Fourteenth Amendment's due process clause. Although neither party has proposed any specific facts concerning plaintiff's status, it is plain that she was an arrestee:  she had been arrested without a warrant and had not yet appeared before a judge for a determination of probable cause. Currie, 728 F.3d at 631 ("arrestee" is someone who has not had a probable cause hearing); Villanova v. Abrams, 972 F.2d 792, 797 (7th Cir. 1992) ("the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made"). Accordingly, I will disregard plaintiff's assertion

that she was a pretrial detainee and apply the Fourth Amendment's "objective reasonableness" inquiry to both of her claims.  This means it is unnecessary for her to show that Budreau acted with "deliberate indifference," as she argues in her brief.

1.  <u>Excessive force</u>

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  Excessive force claims are reviewed under the Fourth Amendment's "objective reasonableness" standard, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  "The <u>Graham</u> standard is fact-intensive, asking whether each use of force was reasonable under the totality of the circumstances, 'including the severity of the crimes at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" <u>Turner v. City of Champaign</u>, 979 F.3d 563, 567 (7th Cir. 2020) (quoting <u>Graham</u>, 490 U.S. at 396). "Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide."  <u>Phillips v. Community Ins. Corp.</u>, 678 F.3d 513, 520 (7th Cir. 2012). <u>See also</u> <u>Siler v. City of Kenosha</u>, 957 F.3d 751, 759 (7th Cir. 2020) ("[W]e may consider reasonableness as a matter of law when there are sufficient undisputed material facts to draw a conclusion.").

10

Courts have found in some instances that an excessive force claim may lie when prison guards or jailers use chemical agents on an inmate and then unjustifiably refuse to allow the inmate to shower or wash off the substance. In general, however, cases in which prolonged exposure to pepper spray has been found to constitute an unlawful application of force involve far longer periods of time than elapsed in this case. See, e.g., Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996) (inmate exposed to mace for eight hours while confined in four point restraints); Mann v. Failey, 578 Fed. App'x. 267, 273-74 (4th Cir. 2014) (inmate not permitted to shower for four days after being pepper sprayed); McNeeley v. Wilson, No. 2:12-cv-488-FtM-38MRM, 2015 WL 5159097 at *7 (M.D. Fla. Sept. 2, 2015) (inmate exposed to pepper spray for four hours while confined in four point restraints). On the other hand, courts generally find no constitutional violation when the individual is given an opportunity to decontaminate fairly promptly after being exposed to chemical agents or pepper spray. See, e.g., Jones v. Shields, 207 F.3d 491 (8th Cir. 2000) (concluding that waiting 10 to 20 minutes before allowing inmate to wash off chemical agent did not give rise to constitutional violation); Perkinson v. White, No. 5:13-CT-3004-FL, 2015 WL 333012, at *4 (E.D.N.C. Jan. 26, 2015) (finding no constitutional violation where use of pepper spray was justified and inmate was allowed to decontaminate approximately 30 minutes later); Laurensau v. Coi, No. 12-623, 2014 WL 6774125, *5-6 (W.D. Pa. Dec. 1, 2014) (finding no constitutional violation where use of pepper spray was justified and nurse washed out prisoner's eyes within 30 minutes).

11

In this case, it is undisputed that plaintiff was allowed to decontaminate from the pepper spray promptly upon her arrival at the jail, approximately 40 minutes after her exposure.  Wisely, she does not appear to argue that 40 minutes was unreasonable as a matter of law, for there is no case that stands for that proposition.  Instead, she argues that a jury could conclude that Budreau's failure to provide her "some moderate level of field decontamination after the scene was secure" was objectively unreasonable.

Plaintiff's argument is unpersuasive.  Even viewed in the light most favorable to plaintiff, the facts of this case establish that Budreau responded in an objectively reasonable manner to plaintiff's pepper spray exposure.  First, to the extent plaintiff argues that Budreau failed to comply with Bayfield County's OC exposure policy by failing to "promptly" provide her with water, it is well-settled that the violation of departmental prison policy or other state law does not give rise to a federal constitutional claim.  Wozniak v. Adesida, 932 F.3d 1008, 1011 (7th Cir. 2019) ("constitutional suit is not a way to enforce state law through the back door"); Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003) (observing that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations").

Second, Budreau had limited involvement with plaintiff on the scene, and did not even realize she had been exposed to pepper spray until Swan came back inside the house after securing plaintiff in his squad.  Contrary to plaintiff's argument, the fact that Budreau could hear plaintiff yelling before Swan escorted her outside does not create more than a metaphysical dispute concerning Budreau's knowledge:  as he testified, he was not focused

on what plaintiff was saying because Novak and Swan were handling plaintiff and he was focused on the main floor occupants.  Moreover, even if Budreau might have inferred earlier that plaintiff was exposed to pepper spray, it plainly would not have been unreasonable for him to defer plaintiff's care to Swan and Novak, who were managing her at that time.

Critically, nothing suggests that Budreau ignored plaintiff's exposure or sought to prolong it.  When he learned she had been exposed, he responded by offering to take custody of her and drive her to the jail, which undisputably had the nearest decontamination station.  By the time Budreau took her into physical custody, plaintiff was no longer screaming or complaining of pain and showed no signs of obvious distress.

Plaintiff faults Budreau for failing to obtain a wet towel from the residence or saline from the ambulance before departing for the jail.  However, the question under the Fourth Amendment is only whether the officers acted reasonably, not whether there were other steps they might have taken that were less intrusive.  Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994).  In addition, the excessive force analysis balances the nature and quality of the intrusion against the countervailing governmental interests at stake.  Graham, 490 U.S. at 396.  Here, Budreau had other interests besides plaintiff's to consider, namely, those of the victim, Washeleski-Burns, and the other individuals on the scene.  It would cross the line into impermissible second-guessing to say that Budreau acted unreasonably simply because he did not either (1) ask Washeleski-Burns if he could use items from her residence to provide relief to the person who moments earlier had attacked her, or (2) divert the attention of the EMS staff who were assessing Washeleski-Burns in order to obtain saline

from the ambulance.  As <u>Graham</u> makes clear, any reasonableness determination must account for the fact that officers making on-scene decisions are often operating under rapidly-evolving conditions and under the press of time.  No reasonable jury could find that it was objectively unreasonable for Budreau to decide that taking plaintiff to the closest decontamination station where there was baby shampoo and an unlimited supply of water was the most efficient and prudent course of action under the circumstances.  Accordingly, plaintiff's excessive force against Budreau must be dismissed.

## 2.  Qualified immunity

Alternatively, even if plaintiff had presented enough evidence to support a finding of objective unreasonableness, Budreau is shielded by qualified immunity.  Qualified immunity protects government officials from liability, even in cases with plainly bad outcomes, if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  This doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  <u>Id.</u>  "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law."  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

14

Excessive force cases, in particular, call for careful application of the doctrine, because excessive force is an area of the law "in which the result depends very much on the facts of each case." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018). See also City of Tahlequah, Oklahoma v. Bond, 142 S. Ct. 9, 11-12(2021) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted). Police officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue." Cibulka v. City of Madison, 992 F.3d 633, 639 (7th Cir. 2021). Thus, to overcome qualified immunity in an excessive-force case, the plaintiff must either (1) identify a closely analogous case that established a right to be free from the type of force the police officers used, or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. Id.

Plaintiff argues that it was clearly-established law that "the failure to provide basic care after exposing an individual to OC spray" constitutes excessive force under the Fourth Amendment. Plaintiff relies primarily on LaLonde v. Cty. of Riverside, 204 F.3d 947 (9th Cir. 2000). In LaLonde, a police officer deployed pepper spray into LaLonde's face as he was resisting arrest. Id. at 952. The officer and his partner then handcuffed LaLonde and brought him to the couch, where he sat for 20 to 30 minutes with redness around his eyes, mucus hanging from his nose, and tears running down his face. Id. Although the officers admitted they were trained to take all possible steps to assist someone after spraying them

15

with pepper spray, both officers acknowledged offering no first aid to LaLonde.  One officer claimed that LaLonde was "still combative"; the other offered no excuse whatsoever. However, when two other officers arrived about 20-30 minutes after LaLonde had been sprayed, they "almost immediately" got a wet dish towel from the kitchen and wiped LaLonde's face.  The Ninth Circuit reversed the district court's grant of qualified immunity to the first officers on LaLonde's excessive force claim, finding that "any reasonable officer would know that a continued use of [pepper spray] or a refusal without cause to alleviate its harmful effects constitutes excessive force."  Id. at 961.

Contrary to plaintiff's contention, LaLonde is not "closely analogous" to this case. Critically, unlike LaLonde, who was detained in his own apartment where we can presume water was readily accessible, plaintiff was – by necessity – removed from the home and detained outside in a squad car, away from running water.  (It was the dead of winter in northern Wisconsin, so water from an outdoor hose was not an option.)  Also, unlike the officers in LaLonde who sat idly by while their arrestee suffered, here Budreau – who had no contact with plaintiff inside the residence –  took active steps to get her some relief, offering to take custody of her and drive her to the jail.  During the drive, he radioed ahead to make sure jail staff were ready with baby shampoo and towels, and he repeatedly checked on plaintiff's well-being.  No reasonable officer familiar with LaLonde would have thought that responding to plaintiff's exposure to pepper spray as Budreau did under the particular circumstances he faced, was a Fourth Amendment violation.  Mullenix v. Luna, 577 U.S. 7, 11 (2015) ("A right is clearly established when it is 'sufficiently clear that every reasonable

official would have understood that what he is doing violates that right.'") (citation omitted). Moreover, contrary to plaintiff's contention, the mere fact that the Supreme Court "considered" LaLonde in Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021), a case having nothing to do with pepper spray, does not establish LaLonde as controlling on the specific question presented here.

The other "inadequate decontamination" cases cited in plaintiff's brief do not advance her position.  Nearly all of the cases she cites involved prisoners or detainees in a jail or prison setting, where access to a shower or running water was readily available.  See Nasseri v. City of Athens, 373 F. App'x 15, 18 (11th Cir. 2010) (officers who confined pepper-sprayed inmate in a poorly-ventilated patrol car for an hour without permitting decontamination notwithstanding his complaints that he was having breathing problems, while allowing other detainees to use a hose outside the jail to spray themselves off, were not entitled to qualified immunity on excessive force claim); Danley v. Allen, 540 F.3d 1298, 1304 (11th Cir. 2008) (pretrial detainee adequately alleged unconstitutional excessive force, where he alleged that jailers used more pepper spray on him than necessary, then pushed him back into small, poorly-ventilated cell without allowing him to decontaminate and mocked him as he choked and begged to be let out); Sanders v. Fredricks, No. 10 C 5714, 2016 WL 8711472, at *9 (N.D. Ill. Jan. 8, 2016) (denying summary judgment on prisoner's claim that officers unreasonably denied him opportunity to wash eyes and face for 30 minutes); Taylor v. Books, No. 3:08-CV-562PS, 2009 WL 2044453, at *2 (N.D. Ind. July 7, 2009) (allowing inmate to proceed on claim that prison officials were deliberately indifferent in failing to

treat him and failing to provide him with enough water after he was pepper sprayed).  None of these cases involved an arrestee who had necessarily been removed from the home and secured in a squad car, away from running water.

The only case cited by plaintiff that did involve an arrestee, Aponte v. City of Chicago, 08 C 6893, 2010 WL 2774095 (N.D. Ill. July 14, 2010), is not analogous:  the claim in Aponte was that the officers had used excessive force by deploying a 15-30 second blast of pepper spray directly into the plaintiff's nostrils after he was handcuffed on the ground and not resisting, not that they had failed to provide him prompt aftercare for the pepper spray.  A reasonable officer might well miss the connection between that case and this one, given that the only fact they have in common is an arrestee who was pepper sprayed.

In sum, plaintiff has failed to identify existing, clearly-established precedent that would have put Budreau on notice that his actions violated plaintiff's constitutional right to be free from excessive force.   Accordingly, defendant Budreau is entitled to qualified immunity.

## B.  Response to Medical Needs

### 1. Merits

An officer violates the Fourth Amendment's prohibition on unreasonable seizures when, in the course of making an otherwise lawful arrest, he does not respond reasonably to an arrestee's medical needs.  Sides v. City of Champaign, 496 F.3d 820, 828 (7th Cir. 2007) (citing Graham, 490 U.S. 386, 394–95 (1989)). In determining whether an officer's

18

response to an arrestee's medical needs was objectively unreasonable, four factors are relevant: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. <u>Williams</u>, 509 F.3d at 403.

Plaintiff's claim that Budreau responded unreasonably to her medical needs fails for the same reasons as her excessive force claim does not succeed. As an initial matter, there is no evidence that plaintiff was suffering anything other than the ordinary unpleasant and intended effects of pepper spray: involuntary closing of the eyes and burning and irritated skin. From his training, however, Budreau knew that these effects, while unpleasant, were temporary. <u>Accord</u> <u>Boyce v. McKnight</u>, No. 14-cv-418, 2015 WL 8778330, at *10–11 (N.D. Ill. Dec. 15, 2015) (collecting cases holding that even direct exposure to pepper spray typically results in severe but temporary discomfort that does not pose a long-term health risk). Second, plaintiff did not ask Budreau for any treatment at the scene. Although plaintiff asked Swan and Novak multiple times if they could get some water or wash her eyes out, there is no evidence that Budreau heard this. Even if he did, he could reasonably conclude that Novak and Swan, who were attending to plaintiff at that time, would have provided first aid to plaintiff if it was appropriate and necessary. When he did take custody of plaintiff, she was calm and no longer screaming in purported pain. Third, as discussed above, it was not objectively unreasonable for Budreau to forego attempting to procure a wet towel from plaintiff's victim, Washeleski-Burns, or the other individuals at the scene, or to

determine that EMS should prioritize Washeleski-Burns' injuries over plaintiff's temporary discomfort from the pepper spray.  Finally, the Fourth Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take.  <u>Florek v. Vill. of Mundelein, Ill.</u>, 649 F.3d 594, 600–01 (7th Cir. 2011).  Budreau offered to take custody of plaintiff from Swan and transport her to the closest facility he knew of where she could be decontaminated, he called ahead to make sure decontamination could start promptly on arrival, and he monitored her condition en route.  On these facts, no reasonable jury could conclude that Budreau did not respond in an objectively reasonable manner to plaintiff's medical needs.

2.  <u>Qualified immunity</u>

To defeat Budreau's claim of qualified immunity, plaintiff relies on the same case law she relied on to support her excessive force claim.  Just as those precedents failed to show that it was clearly established that Budreau's actions constituted excessive force, they fail to show that Budreau would have known that his actions constituted an objectively unreasonable response to plaintiff's medical needs.  Accordingly, even if plaintiff could establish that Budreau's response to her medical needs was "unreasonable" under the Fourth Amendment, Budreau is entitled to qualified immunity.

20

### C.  Monell Claim Against Susienka

Finally, because plaintiff cannot establish a constitutional violation, there is no basis to hold the sheriff liable under <u>Monell v. Dep't. of Soc. Services</u>, 436 U.S. 658 (1978).  "It is well established that there can be no municipal liability based on an official policy under <u>Monell</u> if the policy did not result in a violation of [a plaintiff's] constitutional rights." <u>Houskins v. Sheahan</u>, 549 F.3d 480, 493 (7th Cir. 2008) (quoting <u>King v. East St. Louis School Dist. 189</u>, 496 F.3d 812, 817 (7th Cir. 2007)).  Accordingly, defendant Susienka is entitled to summary judgment.

### D.  Remaining Claims Against Defendant Swan

Plaintiff asserts the same claims against Swan as she asserts against Budreau, namely, that he used excessive force and responded unreasonably to her medical needs in effectuating her arrest by failing to provide her prompt aftercare for her pepper spray exposure.  Although Swan did not move for summary judgment, my finding that there was no clearly established legal precedent requiring an officer to provide "field decontamination" for pepper spray exposure under the circumstances that existed in this case seem to preclude plaintiff from recovering against Swan.  Accordingly, if plaintiff intends to proceed on her claims against defendant Swan, she may have until no later than May 12, 2022, to submit a brief showing cause why her claims against Swan should not be dismissed on grounds of qualified immunity.  <u>See</u> Fed. R. Civ. P. 56(f)(1).

ORDER

IT IS ORDERED that the motion for summary judgment by defendants Budreau and Susienka, dkt. #30, is GRANTED.  Pursuant to Fed. R. Civ. P. 54(b), the clerk of court is directed to enter judgment for these defendants and dismiss them from this lawsuit.  Not later than May 12, 2022, plaintiff must submit a brief  showing cause why the claims against Swan should not be dismissed on grounds of qualified immunity.   If she fails to do so, then those claims will be dismissed.

Entered this 28th day of April, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge